TURBIN CHU HEIDT, A Law Corporation
Richard Turbin (1044)
richturbin@turbin.net
Janice D. Heidt (8984)
jheidt@turbin.net
737 Bishop Street, Suite 2730
Honolulu, Hawaii 96813
Telephone: 808-528-4000
Facsimile: 808-599-1984

SCHUBERT JONCKHEER & KOLBE LLP
Amber L. Schubert
aschubert@sjk.law
Daniel L.M. Pulgram
dpulgram@sjk.law
2001 Union St., Ste. 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161

Attorneys for Plaintiff MOLLY OBERG
and the Proposed Class

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MOLLY OBERG,<br><br>*Plaintiff*,<br><br>v.<br><br>COMMUNITY CLINIC OF MAUI, INC. d/b/a MALAMA I KE OLA HEALTH CENTER,<br><br>*Defendant*. | CIVIL NO. ____________________<br>(Other Personal Injury)<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff MOLLY OBERG (hereinafter "Plaintiff" or "OBERG"), on behalf of herself and all others similarly situated, alleges the following complaint against Defendant COMMUNITY CLINIC OF MAUI, INC. d/b/a MALAMA I KE OLA HEALTH CENTER (hereinafter "MALAMA" or "Defendant") upon personal knowledge as to her own acts, and based upon her investigation, her counsel's investigation, and information and belief as to all other matters.

## NATURE OF THE CASE

1. This is a Class Action to recover damages sustained and suffered by Plaintiff, on behalf of herself and all others similarly situated, caused by a) Defendant's negligent failure to implement adequate security measures to protect the confidentiality of patient health information and other personal information, and b) Defendant's negligent and unreasonable delay in notifying victims after Defendant learned unauthorized parties had hacked its computer systems and accessed the MALAMA computer network, including all patient PII (Personal Identifying Information) and PHI (Personal Health Information), all of which encompassed an extreme degree of highly sensitive information.

2. Plaintiff, individually and on behalf of all others similarly situated, alleges claims of Negligence, Breach of Implied Contract, and Unjust Enrichment.

3. Plaintiff, individually and on behalf of all others similarly situated, further asks the Court to compel Defendant to adopt reasonable information security practices to secure the sensitive PHI and PII that Defendant collects and stores in its databases and to grant such other relief as the Court deems just and proper.

## PARTIES

***Plaintiff***

4. Plaintiff MOLLY OBERG is a resident and citizen of Haiku, Hawaiʻi, who used Defendant MALAMA's services. On October 12, 2024 she received a notice from Defendant informing her that her PII (Personal Identifying Information) and PHI (Personal Health Information) had been breached.

***Defendant***

5. Defendant COMMUNITY CLINIC OF MAUI, INC. d/b/a MALAMA I KE OLA HEALTH CENTER a is a non-profit community health organization located in Wailuku, Hawaiʻi. It is organized in Hawaiʻi and its main clinic is located at 1881 Nani St. Wailuku, HI 96793.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction and diversity jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The

class contains more than 100 members (indeed, MALAMA identified that more than 123,000 people were impacted), and many of these members have citizenship diverse from MALAMA.

7. MALAMA's data breach notice provided information for putative class members who are citizens of Iowa, Maryland, Massachusetts, New York, North Carolina, Oregon, Washington, DC, and New Mexico.[1] Pursuant to California's requirement that companies provide notice of data breaches affecting more than 500 California residents, MALAMA provided notice of the Breach to the California Attorney General and California class members.[2] It also notified the Maine Attorney General that at least one Maine resident was a putative class member.[3] In light of the transient nature of many Hawai'i residents and the substantial number of visitors the island received during the Class Period, on information and belief, a substantial portion of the putative class is composed of citizens of others states.[4]

[1] *See* Notice of Data Breach, https://www.ccmaui.org/privacy-security-notice (last visited Nov. 6, 2024).
[2] *See* https://oag.ca.gov/ecrime/databreach/reports/sb24-592480 (last visited Nov. 6, 2024).
[3] *See* Office of the Maine Attorney General, Data Breach Notifications, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/ac47803d-f89e-4fe4-ba50-30f2bb8b1f1b.html (last visited Nov. 6, 2024);
[4] *See* State of Hawai'i, Department of Business, Economic Development & Tourism, 2023 Annual Visitor Research Report, https://www.hawaiitourismauthority.org/media/13190/2023-annual-report-final.pdf at 13 (last visited Nov. 6, 2024) .

8. The exercise of personal jurisdiction over MALAMA is appropriate as its headquartered in the State of Hawai'i and conducts substantial business in the State of Hawai'i.

9. Venue is proper in the District of Hawai'i under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because a substantial part of the events giving rise to the claims emanated from activities within the State of Hawaii, and MALAMA is headquartered and conducts business in the State of Hawai'i.

## FACTUAL ALLEGATIONS

### I. Background:

10. Defendant MALAMA is a community health organization located in Wailuku, Hawai'i. It provides a wide range of healthcare services.

11. Plaintiff and members of the Plaintiff Class are former or current patients who used MALAMA's services.

12. In order to receive treatment, Plaintiff and class members were required to provide all or part of the following non-exclusive list of sensitive PHI and PII during the regular course of business:

- Full name and mailing or personal address
- Social Security Number
- Date of Birth
- Driver's License Number
- State ID Number

- Passport Number,
- Financial Account/Bank Account Number
- Routing Number
- Bank Name
- Credit/Debit Card Number
- Card CVV and expiration date
- Security PIN/Security Code
- Login Information
- Medical Diagnosis Information
- Clinical Information
- Medical Treatment/Procedure Information
- Treatment Type,
- Treatment Location,
- Treatment Cost Information
- Doctor's Name
- Medical Record Numbers
- Patient Account Numbers
- Prescription information
- Biometric Data.

13. The above information is extremely sensitive personal identifying information and personal health information (PII and PHI). This information is extremely valuable to criminals because it can be used to commit serious identity theft and medical identity theft crimes.

14. As a condition of doing business and obtaining the services of MALAMA, class members entrusted MALAMA with this information with the

explicit and implicit understanding that the information would be kept secure and that reasonable measures would be taken to maintain and ensure the security, including timely notification in the event of a breach, commensurate with the value of data. This commitment to keeping patient data secure was noted on Defendant's website including its HIPAA notice.

## II. The Breach

15. At least as early as May 7, 2024, MALAMA became aware of suspicious activity causing major computer problems in its computer systems.

16. These problems led to a major disruption of MALAMA services and caused the clinic to close for at least two weeks. According to reports, when the clinic health center finally reopened, Defendant had switched to almost all physical documents and charting. According to the report dated May 22, 2024 "Patients are clueless about what is going on and say they want answers."[5]

17. On information and belief, at this time MALAMA was aware that it has been the subject of cyberattack and data breach by the ransomware gang "Lockbit." MALAMA did not disclose to patients at that time that the disruption was caused by a ransomware attack.

[5] https://www.hawaiinewsnow.com/2024/05/23/maui-health-center-dealing-with-major-tech-issues-affecting-thousands/

18. By June 2024, even as reports were emerging that MALAMA had been targeted by Lockbit, MALAMA continued to deflect and obfuscate the nature of the data breach. According to an article published on June 19, 2024, a MALAMA spokesperson, Sarah Goonting, refused to answer questions about Lockbit or an alleged ransom and instead said "Our systems are fully operational. We are continuing to update our patients and employees about the incident and will ensure that in the event the forensic investigation confirms any impact to patient data, that impacted patients, if any, are properly notified."[6]

19. These statements by MALAMA were, at best, misleading. On information and belief, MALAMA was fully aware of the Lockbit attack and that patient data had been compromised.

20. Moreover, at least as early as August 7, 2024, MALAMA had determined that personal information and health information had been breached and had concluded what it described as a "extensive forensic investigation and comprehensive document review."[7]

21. However, MALAMA did not begin sending notices to the impacted parties until at least September 26, 2024. MALAMA did not offer any explanation for this delay.

[6] https://www.hawaiinewsnow.com/2024/06/20/maui-health-center-allegedly-attacked-by-russian-hackers/
[7] https://www.ccmaui.org/privacy-security-notice

22. Despite MALAMA stating in its September 26 public notice that it would be mailing notice letters with more information to impacted individuals for whom they had a mailing address, it took a substantial time for many individuals to receive their letters, including Plaintiff. For example, Plaintiff did not receive the letter until October 12, more than two weeks later.

23. The delay between the May 7 major services disruption and ransomware attack and the actual notification of a data breach to impacted parties on September 26, 2024 was unreasonable and directly harmed patients, including Plaintiff. Moreover, MALAMA unreasonably delayed between when it concluded its investigation (August 7, 2024) and its notification to patients (September 26, 2024).

24. Additionally, MALAMA made public statements about how rapidly they would advise patients who had been victims of the data breach. Specifically, MALAMA made a media statement in June 2024 that it would ensure "that impacted patients, if any, are properly notified."[8] A proper notification would be to immediately notify impacted patients, not to wait and delay for more than three months.

[8] https://www.hawaiinewsnow.com/2024/06/20/maui-health-center-allegedly-attacked-by-russian-hackers/

25. It remains unclear precisely how the breach occurred and exactly what, if any, measures MALAMA has taken or is taking to ensure the security of customer data and to protect against any additional incidents.

26. The scope of the Data Breach is substantial. MALAMA has reported that at least 123,882 individuals were impacted by the data breach.[9] Likewise, the scope of the breached data breached is extensive. MALAMA reported that the breached data included, "first and last names with one or more of the following identifiers: Social Security Number, Date Of Birth, Driver's License Number / State Id Number, Passport Number, Financial Account Number, Routing Number, Bank Name, Credit / Debit Card Number, Card CVV Expiration Date, Pin/Security Code, Login Information, Medical Diagnosis, Clinical Information, Medical Treatment/Procedure Information, Treatment Type, Treatment Location, Treatment Cost Information, Doctor's Name, Medical Record Number, Patient Account Number, Prescription Information and/ or Biometric Data."[10] This amount of highly sensitive personal identifying and health information is extremely valuable to criminal groups and identity thieves, and patients would have understood that MALAMA had an obligation to take reasonable measures to protect the data.

[9] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/ac47803d-f89e-4fe4-ba50-30f2bb8b1f1b.html

[10] https://www.ccmaui.org/privacy-security-notice

## III. MALAMA's Privacy Representations

27. MALAMA acknowledges its legal and contractual obligations to protect its patients' sensitive PII and PHI. According to the Defendant's required Notice of Privacy Practices, MALAMA stated: "We are required by law to make sure that health information that identifies you is kept private." In order to make sure that the PHI and PII is kept private, MALAMA had an obligation to at minimum undertake reasonable measures to secure this extremely sensitive data and unequivocally communicate this to Plaintiff and the class.

## IV. MALAMA Failed to Comply with Reasonable Cybersecurity Standards

28. At all times relevant to this Complaint, MALAMA knew or should have known the significance and necessity of safeguarding its customers' PII and PHI, and the foreseeable consequences of a data breach. MALAMA knew or should have known that because it collected and maintained the PII and PHI for a significant number of customers, a significant number of customers would be harmed by a breach of its systems. MALAMA further knew due to the nature of its business as a health care services provider, that a data breach could potentially result in the release of deeply personal, sensitive, and costly information about its patients.

29. Because PII is so sensitive and cyberattacks have become a rising threat, the FTC has issued numerous guides for businesses holding sensitive PII

and emphasized the importance of adequate data security practices. The FTC also stresses that appropriately safeguarding PII held by businesses should be factored into all business-related decision making.

30. An FTC Publication titled "Protecting Personal Information: A Guide for Business" lays out fundamental data security principles and standard practices that businesses should implement to protect PII.[11] The guidelines highlight that businesses should (a) protect the personal customer information they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems.

31. The FTC also recommends businesses use an intrusion detection system, monitor all incoming traffic to the networks for unusual activity, monitor for large amounts of data being transmitted from their systems, and have a response plan prepared in the event of a breach.

32. The FTC also recommends that businesses limit access to sensitive PII, require complex passwords to be used on the networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security

[11] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business. (last accessed Nov. 6, 2024)

measures—a step that would have been particularly prudent in light of the methods used by the perpetrators in this case.

33. Businesses that do not comply with the basic protection of sensitive PII are facing enforcement actions brought by the FTC. Failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data is an unfair act or practice prohibited pursuant to Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

34. Many states' unfair and deceptive trade practices statutes are similar to the FTC Act, and many states adopt the FTC's interpretations of what constitutes an unfair or deceptive trade practice.

35. MALAMA knew or should have known of its obligation to implement appropriate measures to protect its customers' PII but failed to comply with the FTC's basic guidelines and other industry best practices, including the minimum standards set by the National Institute of Standards and Technology Cybersecurity Framework Version 1.1.[12]

36. Defendant's failure to employ reasonable measures to adequately safeguard against unauthorized access to PII constitutes an unfair act or practice as prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, as well as by state statutory analogs.

[12] https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf. (last accessed 11/27/2023)

37. MALAMA failed to use reasonable care in maintaining the privacy and security of Plaintiff' and Class Members' PII and PHI. If MALAMA had implemented adequate security measures, cybercriminals could never have accessed the PII of Plaintiff and Class Members, and the Data Breach would have either been prevented in its entirety or have been much smaller in scope. For example, if MALAMA had implemented adequate systems sequestering different types of sensitive data on different computers and allowed access on a need-based basis the data breach may have been much smaller in scope. Likewise, if MALAMA had implemented adequate security systems it could have detected and stopped the intrusion long before it accessed sensitive information on more than 123,000 patients. There would almost never be a business need to access this information and the access attempt should have immediately raised alarms. Additionally, while we do not yet know the precise reasons for the breach, poor data security practices and lack of compartmentalization are common patterns in data breaches of this magnitude and sensitivity. Finally, once MALAMA became aware of the breach, they could have acted far faster and more aggressively in responding to the breach and in assisting victims in redressing harms, including sending notifications to those impacted.

38. Personally Identifiable Information is of high value to criminals. Sensitive information can often be sold on the dark web, with personal

information being sold at a price ranging from $40 to $200 and bank details with a price from $50 to $200.[13] The Data Breach exposed PII that is both valuable and highly coveted on underground markets because it can be used to commit identity theft and financial fraud. Identity thieves use such PII to, among other things, gain access to bank accounts, social media accounts, and credit cards. Identity thieves can also use this PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government identification cards, or create "synthetic identities." Additionally, identity thieves often wait significant amounts of time—months or even years—to use the PII obtained in data breaches because victims often become less vigilant in monitoring their accounts as time passes, therefore making the PII easier to use without detection.

39. Victims of data breaches are much more likely to become victims of identity fraud than those who have not. Data Breach victims who do experience identity theft often spend hundreds of hours fixing the damage caused by identity thieves.[14] Both Plaintiff OBERG and members of the member class generally have spent hours on end and considerable time and stress in attempting to mitigate

---

[13] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed November 6, 2024).

[14] https://www.marylandattorneygeneral.gov/ID%20Theft%20Documents/Identitytheft.pdf. (last accessed 12/06/2023)

the present and future harms caused by the breach. The U.S. Department of Justice's Bureau of Justice Statistics has reported that, even if data thieves have not caused financial harm, data breach victims "reported spending an average of about 7 hours clearing up the issues."[15]

40. The information compromised in the Data Breach—including detailed medical information is much more valuable than the loss of credit card information in a retailer data breach. There, victims can simply close their credit and debit card accounts and potentially even rely on automatic fraud protection offered by their banks. Here, however, the information compromised is much more difficult, if not impossible, for consumers to re-secure after being stolen because it goes to the core of their identity. An individual's medical history and assessments are permanent and are impossible to escape. The loss of all this medical data puts MALAMA patients at additional risk for potential medical fraud and medical identity theft. Indeed, this is especially true for the MALAMA breach where not only was medical and personal information stolen, but also personal private ID information such as state ID numbers, drivers license numbers, passport numbers, and biometric data, which are very difficult or impossible to change.

[15] https://bjs.ojp.gov/content/pub/pdf/vit14.pdf. (last accessed Dec. 6, 2023)

41. Data breaches involving medical records are not only incredibly costly, they can "also [be] more difficult to detect, taking almost twice as long as normal identity theft."[16] The FTC warns that a thief may use private medical information to, among other things, "see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care"[17] and that this may have far reaching consequences for a victim's ability to access medical care and use insurance benefits.

42. Security standards for businesses storing PII and PHI commonly include, but are not limited to:

a. Maintaining a secure firewall
b. Monitoring for suspicious or unusual traffic on the website
c. Looking for trends in user activity including for unknown or suspicious users
d. Looking at server requests for PII
e. Looking for server requests from VPNs and Tor exit notes
f. Requiring Multi-factor authentication before permitting new IP addresses to access user accounts and PII
g. Structuring a system including design and control to limit user access as necessary including a users access to the account data and PII of other users.

---

[16] *See What to Know About Medical Identity Theft*, Federal Trade Commission Consumer Information, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Nov. 6, 2024).
[17] *Id*

43. The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity and protection of PII which includes basic security standards applicable to all types of businesses.

44. The FTC recommends that businesses:

a. Identify all connections to the computers where sensitive information is stored.
b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.
c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.
d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.
e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.
f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.
g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall

separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

45. As described further below, Defendant owed a duty to safeguard PII and PHI under several statutes, including the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTC Act") and as a covered entity under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), to ensure that all information it received, maintained, and stored was secure. These statutes were enacted to protect Plaintiff and the Class Members from the type of conduct in

which Defendant engaged, and the resulting harms Defendant proximately caused Plaintiff and the Class Members.

46. Under the FTC Act, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard the PII and PHI of Plaintiff and Class Members. Under HIPAA, 42 U.S.C. § 1320d, and its implementing regulations, 45 C.F.R. §§ 160, *et seq.*, Defendant had a duty to securely store and maintain the PII and PHI of Plaintiff and Class Members which was collected in conjunction with receiving medical services.

47. Defendant breached its duty to exercise reasonable care in protecting Plaintiff and Class Members' PII and PHI by failing to implement and maintain adequate data security measures to safeguard Plaintiff's and Class Members' sensitive personal information, failing to encrypt or anonymize PII and PHI within its systems and networks, failing to monitor its systems and networks to promptly identify and thwart suspicious activity, failing to delete and purge PII and PHI no longer necessary for its provision of healthcare services to its clients and customers, allowing unmonitored and unrestricted access to unsecured PII and PHI, and allowing (or failing to prevent) unauthorized access to, and exfiltration of, Plaintiff's and Class Member's confidential and private information. Additionally, Defendant breached its duty by utilizing outdated and ineffectual data security measures which deviated from standard industry best practices at the

time of the Data Breach. Through these actions, Defendant also violated its duties under the FTC Act and HIPAA.

48. Defendant failed to prevent the Data Breach. Had Defendant properly maintained and adequately protected its systems, servers, and networks, the Data Breach would not have occurred.

49. Additionally, the law imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of PII and PHI to Plaintiff and Class Members so that they can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuses of their private information. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members. In so doing, Defendant actually and proximately caused and exacerbated the harm from the Data Breach and the injuries-in-fact of Plaintiff and Class Members.

50. By Defendant's own admission, on May 4, 2024, unauthorized agents gained access to internal information and systems, and it took weeks for Defendant to attempt to fix the breach.

## V. Plaintiff and Class Experiences

51. As a precondition for using Defendant's healthcare service, Plaintiff provided sensitive PII and PHI. Defendant represented to Plaintiff in the October 12 letter (dated September 26, 2024) that the breached data included first and last

names with one or more of the following identifiers: Social Security Number, Date Of Birth, Driver's License Number / State Id Number, Passport Number, Financial Account Number, Routing Number, Bank Name, Credit / Debit Card Number, Card CVV Expiration Date, Pin/Security Code, Login Information, Medical Diagnosis, Clinical Information, Medical Treatment/Procedure Information, Treatment Type, Treatment Location, Treatment Cost Information, Doctor's Name, Medical Record Number, Patient Account Number, Prescription Information and/ or Biometric Data. Plaintiff has taken reasonable steps to maintain the confidentiality of her PII. She relied upon MALAMA's representations, experience, and sophistication to keep her information secure and confidential.

52. As a result of the data breach, Plaintiff was forced to take measures to mitigate the harm, including spending time monitoring her credit and financial accounts, researching the Data Breach, and researching and taking steps to prevent and mitigate the likelihood of identity theft.

53. Plaintiff OBERG lives in Hawai'i and has been a patient of MALAMA. As a result of the Data Breach, Plaintiff OBERG suffered actual injuries including: (a) paying money to MALAMA for services, which Plaintiff would not have done had MALAMA disclosed that it lacked data security practices adequate to safeguard Plaintiff's PII and PHI from theft; (b) damages to

and diminution in the value of Plaintiff's PII and PHI—property that Plaintiff entrusted to MALAMA as a condition of receiving its services; (c) loss and invasion of Plaintiff' privacy; and (d) injuries arising from the increased risk of fraud and identity theft, including the cost of taking reasonable identity theft protection measures, which will continue for years.

## CLASS ACTION ALLEGATIONS

54. Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil Procedure, on behalf of herself and a Nationwide Class defined as follows:

> **All persons in the United States whose PII/PHI were compromised by the Data Breach announced by MALAMA in September 2024.**

55. Excluded from the Nationwide Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Nationwide Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

56. This action is brought and may be properly maintained as a class action pursuant to Rule 23. This action satisfies the requirements of Rule 23, including numerosity, commonality, typicality, adequacy, predominance, and superiority.

57. **Numerosity.** The Nationwide Class are so numerous that the individual joinder of all members is impracticable. While the Nationwide Class exact number are currently unknown and can only be ascertained through appropriate discovery, Plaintiff, on information and belief, allege that the Nationwide Class includes at least 123,000 members based on representations by MALAMA.

58. **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Nationwide Class Members. These common questions, which do not vary among Nationwide Class Members and which may be determined without reference to any Nationwide Class Member's individual circumstances, include, but are not limited to:

a. Whether Defendant knew or should have known that its systems were vulnerable to unauthorized access;
b. Whether Defendant failed to take adequate and reasonable measures to ensure its data systems were protected;
c. Whether Defendant failed to take available steps to prevent and stop the breach from happening or mitigating the risk of a long-term breach;
d. Whether Defendant unreasonably delayed in notifying patients once they discovered suspicious activity.
e. Whether Defendant unreasonably delayed in notifying patients they had confirmed a breach of their data systems.

f. Whether Defendant unreasonably delayed in notifying victims once Defendant had concluded its investigation.

g. Whether Defendant owed a legal duty to Plaintiff and Class Members to protect their PII and PHI;

h. Whether Defendant breached any duty to protect the personal information of Plaintiff and Class Members by failing to exercise due care in protecting their PII and PHI;

i. Whether Plaintiff and Class Members are entitled to actual, statutory, or other forms of damages and other monetary relief; and,

j. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief or restitution.

59. **Typicality.** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way.

60. **Adequacy of Representation.** Plaintiff is an adequate Nationwide Class representative because she is a Nationwide Class Member, and her interests do not conflict with the Nationwide Class interests. Plaintiff retained counsel who are competent and experienced in class action and data breach litigation. Plaintiff and their counsel intend to prosecute this action vigorously for the Nationwide Class's benefit and will fairly and adequately protect their interests.

61. **Predominance and Superiority.** The Nationwide Class can be properly maintained because the above common questions of law and fact

predominate over any questions affecting individual Nationwide Class Members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Nationwide Class member's claim is impracticable. Even if each Nationwide Class member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

62. **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. Defendant has acted

and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

## CLAIMS FOR RELIEF

### Count 1
### Negligence
### On behalf of Plaintiff and the Nationwide Class

63. Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

64. Plaintiff was required to provide PII and PHI as a precondition for using the MALAMA healthcare services.

65. Plaintiff and Class Members entrusted their PII and PHI to MALAMA with the understanding that MALAMA would safeguard their PII and PHI.

66. In its written privacy policies, MALAMA committed to taking reasonable steps to protecting patient PHI and PII. MALAMA also acknowledged its obligation to abide by privacy regulations including HIPAA and committed to limit the degree to which this sensitive information was shared with other parties.

67. MALAMA specifically acknowledged that it was "required by law to make sure that health information that identifies you is kept private."

68. However, it appears that more than 123,000 patients (including Plaintiff) had sensitive data "shared" with hackers without their knowledge or consent.

69. MALAMA did not take reasonable and appropriate safeguards to protect Plaintiff and Class Members' PII.

70. MALAMA had full knowledge of the sensitivity of the PII that it stored and the types of harm that Plaintiff and Class Members could and would suffer if that PII were wrongfully disclosed.

71. MALAMA violated its duty to implement and maintain reasonable security procedures and practices. That duty includes, among other things, designing, maintaining, and testing MALAMA's information security controls sufficiently rigorously to ensure that PII and PHI in its possession was adequately secured by, for example, encrypting sensitive personal information, installing effective intrusion detection systems and monitoring mechanisms, using access controls to limit access to sensitive data, regularly testing for security weaknesses and failures, failing to notify customers of the breach in a timely manner, and failing to remedy the continuing harm by unreasonably delaying notifying specific victims who were harmed.

72. MALAMA's duty of care arose from, among other things,

a. MALAMA's exclusive ability (and Class Members' inability) to ensure that its systems were sufficient to protect against the foreseeable risk that a data breach could occur;
b. Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures;
c. HIPAA, 42 U.S.C. § 1320d, and its implementing regulations, 45 C.F.R. §§ 160, *et seq.*, under which Defendant had a duty to securely store and maintain the PII and PHI of Plaintiffs and Class Members, which was collected in conjunction with receiving healthcare services. Additionally, the HIPPA Breach Notification Rule, 45 C.F.R. § 164.400-414, required Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."
d. MALAMA's common law duties to adopt reasonable data security measures to protect customer PII and to act as a reasonable and prudent person under the same or similar circumstances would act;

73. These statutes—the FTC Act and HIPAA—were enacted to protect Plaintiff and the Class Members from the type of wrongful conduct in which Defendant engaged.

74. MALAMA's violation of the FTC Act and HIPAA constitutes negligence per se for purposes of establishing the duty and breach elements of Plaintiff's negligence claim. Those statutes were designed to protect a group to

which Plaintiff belongs and to prevent the types of harm that resulted from the Data Breach.

75. Plaintiff and Class Members were the foreseeable victims of MALAMA's inadequate data security. MALAMA knew that a breach of its systems could and would cause harm to Plaintiff and Class Members.

76. MALAMA's conduct created a foreseeable risk of harm to Plaintiff and Class Members. MALAMA's conduct included its failure to adequately mitigate harm through negligently failing to inform patients and victims of the breach for nearly three months after the purported first discovery of suspicious activity.

77. MALAMA knew or should have known of the inherent risks in collecting and storing massive amounts of PII and PHI, the importance of providing adequate data security over that PII and PHI, and the frequent cyberattacks within the medical industry.

78. MALAMA, through its actions and inactions, breached its duty owed to Plaintiff and Class Members by failing to exercise reasonable care in safeguarding their PII and PHI while it was in their possession and control. MALAMA breached its duty by, among other things, its failure to adopt reasonable data security practices and its failure to adopt reasonable security and notification practices in the result in a breach including monitoring internal

systems and sending notifications to affected victims. MALAMA did not provide sufficient information to patients either while the breach was occurring or immediately afterwards. For months, it downplayed the data breach publicly whilst knowing patient data was compromised.

79. MALAMA inadequately safeguarded consumers' PII and PHI in breach of standard industry rules, regulations, and best practices at the time of the Data Breach.

80. But for MALAMA's breach of its duty to adequately protect Class Members' PII and PHI, Class Members' PII and PHI would not have been stolen.

81. There is a temporal and close causal connection between MALAMA's failure to implement adequate data security measures and notification practices, the Data Breach, and the harms suffered by Plaintiff and Class Members.

82. As a result of MALAMA's negligence, Plaintiff and Class Members suffered and will continue to suffer the damages alleged herein.

83. Plaintiff and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate identity protection services. Plaintiff and Class Members are also entitled to the injunctive relief sought herein.

//
//

**Count 2**
**Breach of Implied Contract**
**On behalf of plaintiff and the Nationwide Class**

84. Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them by reference as though set forth in full.

85. Plaintiff and Class Members entered into an implied contract with MALAMA when they entrusted Defendant with their PII and PHI.

86. As part of these transactions, MALAMA agreed to safeguard and protect the PII of Plaintiff and Class Members and to timely and accurately notify them if their PII or PHI was breached or compromised.

87. Plaintiff and Class Members entered into the implied contracts with the reasonable expectation that MALAMA's data security practices and policies were reasonable and consistent with the legal requirements and industry standards. Plaintiff and Class Members believed that MALAMA would use part of the monies paid to MALAMA under the implied contracts or the monies obtained from the benefits derived from the PII and PHI they provided to fund proper and reasonable data security practices.

88. Plaintiff and Class Members would not have provided and entrusted their PII and PHI to MALAMA or would have paid less for MALAMA's products or services in the absence of the implied contract or implied terms between them

and MALAMA. The safeguarding of the PII of Plaintiff and Class Members was critical to realize the intent of the parties.

89. Plaintiff and Class members fully performed their obligations under the implied contracts with MALAMA.

90. MALAMA breached its implied contracts with Plaintiff and Class Members to protect their PII when it (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) disclosed that information to unauthorized third parties and; (3) failed to notify Plaintiff and Class Members in a reasonably timely manner.

91. As a direct and proximate result of MALAMA's breach of implied contract, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII and PHI; illegal sale of the compromised PII and PHI on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports,

among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII PHI; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the MALAMA Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

92. As a direct and proximate result of the breach, Plaintiff is entitled to relief as set forth herein.

**Count 3**
**Unjust Enrichment**
**On behalf of Plaintiff and the Nationwide Class**

93. Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this by reference as though set forth in full.

94. Plaintiff and Class Members entered into an implied contract with MALAMA when they obtained products or services from MALAMA, joined a healthcare program, or otherwise provided PII or PHI to MALAMA.

95. As part of these transactions, MALAMA agreed to safeguard and protect the PII and PHI of Plaintiff and Class Members and to timely and accurately notify them if their PII was breached or compromised.

96. Plaintiff and Class Members entered into the implied contracts with the reasonable expectation that MALAMA's data security practices and policies were reasonable and consistent with legal requirements and industry standards. Plaintiff and Class Members believed that MALAMA would use part of the monies paid to MALAMA under the implied contracts or the monies obtained from the benefits derived from the PII and PHI they provided to fund proper and reasonable data security practices.

97. Plaintiff and Class Members would not have provided and entrusted their PII and PHI to MALAMA or would have paid less for MALAMA products or services in the absence of the implied contract or implied terms between them and MALAMA. The safeguarding of the PII and PHI of Plaintiff and Class Members was critical to realize the intent of the parties.

98. Plaintiff and Class members fully performed their obligations under the implied contracts with MALAMA.

99. MALAMA breached its implied contracts with Plaintiff and Class Members to protect their PII and PHI when it (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) disclosed that information to unauthorized third parties and; (3) failed to notify Plaintiff and Class Members in a timely and reasonable fashion.

100. As a direct and proximate result of MALAMA's breach of implied contract, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII and PHI; illegal sale of the compromised PII and PHI on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII and PHI; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of MALAMA's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

//

//

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class set forth herein, respectfully request the following relief:

A. That the Court certify this action as a class action and appoint Plaintiff and her counsel to represent the Class;

B. That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendant to adequately safeguard the PII of Plaintiff and the Class by implementing improved security controls;

C. That the Court award compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

D. That the Court award statutory or punitive damages as allowed by law in an amount to be determined at trial;

E. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of Defendant's unlawful acts, omissions, and practices;

F. That the Court award to Plaintiff and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

G. That the Court award pre- and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper

//

//

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all claims so triable.

Dated: Honolulu, HI, ____November 8, 2024________.

_____*/s/* Janice D. Heidt______
Janice D. Heidt
Richard Turbin
Amber L. Schubert
Daniel L.M. Pulgram

Attorneys for Plaintiff and the Proposed Class